# EXHIBIT E

# HOBBY PROTECTION ACT/ANTIQUE GLASSWARE AND CHINA

HR5777
PL 93-167 (Nov. 29, 1973)
15 USC

# HEARING

BEFORE THE

## SUBCOMMITTEE ON COMMERCE AND FINANCE

OF THE

## COMMITTEE ON
## INTERSTATE AND FOREIGN COMMERCE
## HOUSE OF REPRESENTATIVES

NINETY-THIRD CONGRESS

FIRST SESSION

ON

## H.R. 4678, H.R. 1068, H.R. 3668, H.R. 3747, and H.R. 4551

BILLS TO PROTECT CERTAIN HOBBYISTS AND COLLECTORS
OF ANTIQUE GLASSWARE AND CHINA

FEBRUARY 28, 1973

## Serial No. 93–3

Printed for the use of the
Committee on Interstate and Foreign Commerce



U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1973

92–417 O

Mr. Rooney. This will conclude our testimony.

Mr. Moss. We will try to conclude today so the committee will be able to consider the matters for markup purposes.

Next we have a statement from our colleague, Congressman Gude of Maryland. We are pleased to have you with us today.

## STATEMENT OF HON. GILBERT GUDE, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF MARYLAND

Mr. Gude. Mr. Chairman, I appreciate having the opportunity to present this statement to the subcommittee on H.R. 1068 and related legislation, to protect collectors of antique glassware against the manufacture or importation of imitations of such glassware. I have introduced this legislation in both the 92d and 93d Congresses.

I am particularly pleased that the committee has decided to conduct these hearings, and I am convinced that, upon their completion, it will be clear that legislative action is needed.

Many thousands of Americans have taken up the hobby of collecting various antique items. The collection of antique glassware, in particular, has enjoyed enormous upsurge of interest in recent years.

However, most unfortunately, there are those who seek to profit improperly from this public interest by manufacturing reproductions of the original glass pieces—reproductions which, sooner or later, frequently turn up on store shelves being sold as the "real thing." Many of these reproductions are of fairly high quality, making it difficult, if not impossible, for the average collector to judge their real value.

The consequences of this type of activity are obvious. And caveats of "Let the buyer beware," when applied to this situation, can do little good. I am convinced that the legislation befor the subcommittee today would go a long way toward offering a reasonable, responsible solution to this vexing problem.

The measure would essentially provide that any imitation antique glassware product must be permanently and clearly marked with the year of its manufacture. The bill would apply both to glassware manufactured within the United States and to all imported glassware imitations. The provision that the glassware be permanently marked is central to the legislation.

Simple labeling requirements could all too easily be circumvented by anyone intent upon cheating the public.

The present situation is unacceptable. It represents yet another way in which the American consumer—in this case, collectors—suffers from a regrettable lack of protection. Approval of this measure would not remove from the marketplace existing imitation products, but it would clearly close the floodgates on an ever-increasing supply. The legislation should have no adverse effect upon the legitimate manufacturer who seeks to make available to the public low-cost reproductions. It would, however, bring a halt to the spread of a highly unethical practice.

I strongly urge speedy action on this legislation as it is a long overdue and very necessary measure to protect a special consumer group.

Thank you, Mr. Chairman.

Mr. Moss. The hearing is recessed until 1:30 p.m. in this room. (Whereupon, at 12:30 p.m., the subcommittee recessed, to reconvene at 1:30 p.m. the same day.)

(The subcommittee reconvened at 1:30 p.m., Hon. Bob Eckhardt presiding.)

Mr. Eckhardt. The hearing will be resumed.

Mr. Virgil Hancock of the American Numismatic Association from Texas, we are glad to have you here.

## STATEMENT OF VIRGIL HANCOCK, DIRECTOR, AMERICAN NUMISMATIC ASSOCIATION

Mr. Hancock. Thank you, sir. We appreciate the nice weather you are having; it is practically the same as Houston.

I received this notice rather late as I was out of town at the time. At the time, I didn't have a copy of Mr. Staggers' bill.

My name is Virgil Hancock, and I live at 4901 Bellaire Boulevard, Bellaire, Tex. 77401.

I am testifying now in favor of a "Hobby Protection Act," an act substantially such as H.R. 3668 introduced February 5, 1973, by Congressman Joseph M. McDade; H.R. 1068, Mr. Rooney's bill; and H.R. 4768, Mr. Staggers' bill.

In order for H.R. 3668 to be at all effective, very definitely there must be added a prohibition against importation into the United States of imitation hobby items described in the bill's section 5(1). The reason for that being the great majority of reproductions are made overseas—Switzerland, Germany, and the Near East. There are not many homegrown reproductions to date.

For example, to the first line of the bill's stated purpose, there should be added the words: "or importation into the United States" and, in the bill's line 4 (section 2), after the word "manufacture" delete the word "in" and insert the words "or the importation into."

Similarly, on the bill's page 2, line 3 (section 3), delete the word "in" and insert the words "or the importation into."

To remedy any possible failure to have included the naming of some hobby, there might be inserted, page 3, after line 5, a new sentence such as "(D) any other item of a type or class the collection or arrangement of which constitutes a recognized hobby."

Since I am speaking in behalf of the coin-collecting hobby, gentlemen, you will want to know three things about the effect—the favorable effect—upon the coin-collecting hobby, should you vote favorably upon H.R. 3668 with my suggested amendments, H.R. 1068, or H.R. 4678.

1. Is there a need for such an act?
2. How many people will it benefit?
3. What is the annual dollar volume involved?

Gentlemen, instead of my trying to repeat to you what facts I've been told—which would be hearsay—I've asked four experts to testify to those facts of which they each have firsthand information.

I would like to ask permission to bring in one more witness, Jeffrey Coopersmith. I was not able to get hold of him until about 8 this morning.

Mr. Eckhardt. That will be satisfactory.

Mr. Hancock. I have asked each of these to limit their statements to 3 minutes, each one to be available, of course, to your questioning. They will testify in this order:

34

Mrs. Margo Russell, editor of Coin World, the world's largest numismatic weekly newspaper.

Mr. Harvey Stack, one of the partners of Stack's, Inc., New York City, one of the most knowledgeable, most respected coin dealers anywhere in the world.

Mr. Chester Krause, president of Krause Publications, Inc., which company puts out coin magazines, as well as the Numismatic News Weekly.

Mr. Jeffrey Coopersmith, who has been president of the Washington Junior Coin Organization, and, bringing up the rear, Mr. John Jay Pittman, president of the American Numismatic Association—the ANA—which comprises, I'd say, the very top layer of the coin-collecting hobby.

Incidentally, I am one of the seven directors of that organization—the ANA—and also president of the Organization of International Numismatists.

Someone asked earlier how to pronounce the word "numismatists." I tell them I am just a coin collector.

I've already covered the vital need to include a prohibition of the importation into the United States of reproductions, because most of the reproductions of collectors' coins come from Europe, the Near East, and from Southeast Asia. One Chinese in Kuala Lumpur, Malaysia, by the name of C. C. Low, has a Post Office Box 711 that's attractive to the American buyer, and he has boasted of shipping into this country over 40,000 coins in the past 3 years. I have inspected some 10 shipments he has made into the United States, and I have yet to find an original, genuine coin!

An equally important paragraph which should be included in amending H.R. 3668 should be—and I urge it most strongly—a substitute section 3, to read:

Sec. 3. (a) The manufacture or offering for sale or trade in the United States or the importation into the United States for introduction into commerce of any hobby item described in section 5(1) which is a reproduction of such an item, and which is not plainly marked "reproduction" or "COPY" with the date of manufacture, is unlawful and shall be an unfair or deceptive act or practice in commerce under the Federal Trade Commission Act.

The coin such as in my hand, it is a reproduction and you could hardly find room for the word "reproduction" but "COPY" could be put on it.

I think Mr. Moss raised the question of coins still in existence without the word "COPY" in them. I might mention in Los Angeles at the International Coin Show, the collectors operating that show have a little punch and that says "COPY." and, when going through the tables of dealers offering coins for sale, if they find one that is a reproduction, they take it, and bang! They put "COPY" on it. It is not difficult to stamp them with the word "COPY."

(b) Into one surface of any reproduction of a coin or related item the word "COPY" shall be incused to a minimum depth of 1 millimeter or 50 percent of the thickness of the imitation coin or related item, whichever is less, and incused in sans serif capital letters of a vertical measurement not less than 275/100 (2.75) millimeters.

(c) Nothing in this act shall apply to any coins or related items restruck at whatever date in any government or government-authorized

35

mint, nor to any replicas or reproductions provably manufactured prior to the year 1850 A.D.

For example, the Vienna Mint is restriking Maria Theresia's taler. It is dollar size and is still bears the date 1780. They are still making that. That is a government mint coin. Sometimes a government authorizes a private mint to strike coins so anything with government authority is exempted from this.

Gentlemen, I emphasize that the word "COPY" must be cut into the coin. I shall show you specimens of today's reproductions which carry a tiny, difficult to see, raised date of manufacture—which in 20 seconds by the clock can be filed off. The word "COPY" must be incused!

Whether you wish to put the enforcement of this act under the Federal Trade Commission, and with the FTC setting penalties, or whether you wish to include penalties in the act itself, and put the enforcement under the Department of Justice, we do not care—just so long as we get some real protection against these reproductions.

Mr. Moss raised the point this morning about the FTC. He claimed that FTC already has sufficient power in the act, paragraph 5, I believe he said. That may be true. But let me go back 6 years ago, maybe 5, a man named Gregor was advertising coins in the coin magazines and didn't say the coins were reproductions, but he advertised them as genuine coins. He flooded the country. He must have sold a hundred thousand of these coins at I think $13 each around the United States. When I got word of it I picked up the phone and called the FTC and talked to a man who introduced himself to me, as I understand, as the attorney or head of the Deceptive Trade Practice Division, or something like that. When I explained the situation to him, he said, "Well, I tell you, Mr. Hancock, about all we can do is slap the guy on the wrist, why don't you try the postal inspectors!". That was my only experience with FTC. I know of no case where FTC has taken any action against anyone selling reproductions.

I talked to Miss Kinney and she told me Congressman Eckhardt has a bill in preparation which will probably have some teeth in it. My understanding is that you gentlemen will decide whether or not any bill or Hobby Protection Act is to be voted out of your committee and then, if you vote it out, then the full committee will vote without the need of a public hearing, is that correct, Mr. Eckhardt?

Mr. Eckhardt. The public hearing would be in the subcommittee and the bill may be marked up first in this committee and then in the full committee. There will be no necessity of witnesses in the full committee.

Mr. Hancock. As soon as your full committee has the bill ready, if it passes it, has the bill ready for consideration by the Congress, then we hope to have an identical bill such as you write introduced in the Senate so as to avoid conflict of wording later.

Gentlemen, I thank you very much for listening, and the next witness will be—let me just mention, I had asked Mrs. Brooks, Mrs. Mary Brooks if she would testify. I saw her in Los Angeles Saturday and she thought she would, but the Office of Budget and Management frowned on her appearance. But I can say she is not opposed to the bill.

I might mention this, we talked of these high-priced coins. To show that these are not high-price coins, that coin you have there, that

retails to the collector for maybe a dollar or less. There are coins here on the table and you are welcome to look at these and make me an offer after the hearing. But there are coins here that have sold for $1,900 or more, but the thing I am getting across to you is that the inexpensive coins are counterfeited in great, great quantities. If I were going into the counterfeit or reproduction of coins, I would take an inexpensive coin because you could dump hundreds of thousands of them on the market and you would pick up a good piece of change.

Mrs. Russell will tell you about those and the number of people this bill will affect.

## STATEMENT OF MARGO RUSSELL, EDITOR, COIN WORLD

Mrs. Russell. I wanted to tell Congressman Moss that most of us have just come from California and I wanted to report the flowers are blooming and the birds are chirping, but they were slightly kissed with fog.

I am Margo Russell, editor of Coin World, a newspaper published in Sidney, Ohio, for coin collectors. It is said to be the world's largest hobby publication with its average of 80-plus pages and a weekly paid circulation of over 130,000 copies. Coin World and its sister publications, two monthly numismatic magazines, World Coins and Numismatic Scrapbook, have worldwide readership.

Coins and related numismatic items are indelible footsteps of time—objects so historic we can reconstruct entire civilizations from them. For example, that is the only way we know how Cleopatra looked. Incidentally, she didn't bear resemblance to Elizabeth Taylor.

Our young people, thanks to the dedication and concern of Mary T. Brooks, Director of the Mint, are attracted in increasing numbers to the study of coins and medals and their role in history of our great Nation. Students, generations from today, will turn to numismatic items for impressions of our culture in 1973.

It is my understanding the mint has a mailing list of more than 3 million names for its numismatic services and for those of related Government agencies such as the American Revolution Bicentennial Commission and the General Services Administration.

I am using these numbers, Mr. Chairman, because there are thousands of readers of the numismatic press. For example—this may be competition—but I happen to know Coinage magazine has a hundred thousand copies of its magazine on the newsstand every month. I use these numbers to convey the fact that some of our brightest and most inquiring young people are being reached. They not only learn history from coins but also learn an all-important ethic: Misrepresentation and deception have no place anywhere, but especially in numismatics, because we are a multi-million dollar science-hobby-industry.

Unmarked replicas of genuine numismatic items are flagrant falsification, trickery that can cause problems for generations. Because we believe there are loopholes in our existing laws, replica U.S. Colonial coins which preceded official U.S. coinage for more than a hundred years, and U.S. provisional coinage, issued by private banks and coiners during the gold rushes of the 19th century, are being fabricated in giant quantities.

Replicas of U.S. tokens and medals, ancient coins of Greece, Rome, and Judea, and many other items including paper money and ingots,

are being produced. It is a serious problem, sir. The historical and monetary value of the original pieces are threatened.

While the Secret Service does excellent work in its control of counterfeiting of current U.S. coinage, there appears to be no provision for turning back the tide of the unmarked, uncurrent coins, copies produced both here and abroad, and distributed freely.

My colleagues, Virgil Hancock, said a great deal of these coin replicas come from abroad. I happen to have tucked into my bag an order form from an Albany, N.Y., firm which begins with a listing of ancient Greek coins and down to our California $50 private gold pieces and gold bars. They are yours for the buying if you are so inclined.

I wish you could see the sampling of our mail for a month—the steady flow of fake "coins"—some very good, some very crude—sent into our offices by people who believe they have a valuable coin. Many of the pieces are issued in advertising promotions by those not schooled in the dangers such copies present. We dash hopes, disappoint, and disillusion when we tell our correspondents they have a worthless fake, an unmarked replica.

I have a brochure here and I feel the Secret Service will be checking this one. It is from a publishing company promoting the sale of its books. With volume 2 they are giving a Roman coin; with volume 4, they give a medallion. With volume 8 they plan to give a U.S. "half dollar" coined in 1893, a copy that is, which was minted to commemorate the fourth centenary of Columbus discovering America. With volume 19, they are giving a reproduction of a U.S. "half dollar" which was issued in 1918 to honor the Lincoln-Illinois centennial. I am sure their promotion department should have done a little more spade work.

We are certain you and your committee in your wisdom see the dangers of this ever-growing threat to a fine hobby and science. We have great faith that you will see the hobby protection legislation continue on its way to successful passage by the Congress and into law. We thank you, sir, most kindly, for bringing the proposed legislation to this stage.

We would like to include, with your permission, for the record, Coin World's recent editorial position on the Hobby Protection Bill and the fakery all of us deplore. We strongly urge passage of H.R. 3668.

I would add one parenthetical thought, the esteemed and honorable Congresswoman Leonor K. Sullivan, has had difficulty with the Federal Trade Commission in handling her complaint against the misrepresentation of the silver dollar so it will be interesting to see how they will handle our problems when such a fine Congresswoman doesn't get too much action.

Thank you.

(The editorials referred to follow :)

[From Coin World, Wednesday, May 10, 1972]

ONE SMALL STEP . . .

In this day of unmarked numismatic replicas, proposals in congress to legislate illegality of such offenses, plus a steady supply of flagrant copy evils and misrepresentations flowing like sludge into the mainstream of our hobby—we have one minute degree of good news—but such a small step.

The famous merchandising firm of F. W. Woolworth Co. has agreed to add the word "replica" to the label description of the California "gold" tokens it sells. Woolworth has no intention of defrauding or embarrassing anyone in connection with any item it sells, according to one of its buyers who informed an unhappy numismatic customer Woolworth had ordered the label change be made at once.

Apologizing for the inconvenience and embarrassment described by disgruntled Collector Edward Craig, Clifton, N.J., purchaser of unmarked California "gold" tokens, Woolworths refunded the purchase price and the cost of having the pieces mailed to Coin World for examination and confirmation of Reader Craig's suspicions, that the unmarked pieces were replicas and not gold.

Woolworths talked to its supplier of the tokens, advising him of the complaint, and instructed him to add the word "replica" following the description 'gold' token."

What a golden opportunity for this merchandising giant to look like a million dollars! We wish it had instructed the producer of these fakes to mark the pieces themselves—indelibly—as copies. Goldine imitations of the historic pieces usually sell for about $2 for a set of seven pieces. The real tokens, of these denominations, struck in gold, are valued up to $45 each. When the unmarked, fake goldine pieces are separated from the box with its well-meaning "replica" label, then the trouble sets in. We know—here at Coin World we see hundreds of the copies as their hopeful owners wait breathlessly for us to tell them they have a fortune.

At times like this, we offer a silent petition for the successful passage of the Hobby Protection Act—H.R. 10600—which would make unmarked fakes unlawful under the Federal Trade Commission Act. Items represented as gold and silver—marked or unmarked—when they are not produced in these precious metals—become liable to FTC scrutiny anyway. Misrepresentations involving the use of the silverless, circulation-strike Eisenhower dollars are examples of misstatements called to FTC attention by that enterprising lawmaker friend of our hobby, Congresswoman Leonor K. Sullivan (D-Mo.).

[From Coin World, Wednesday, Oct. 25, 1972]

NEVER SAY DIE!

Those close to the progress of the Hobby Protection Act (H.R. 10600) which would protect numismatics against the reproduction or manufacture of imitation hobby items without markings of the calendar year of manufacture say there appears to be a time out before we win the game.

The presently constituted House Committee on Interstate and Foreign Commerce, including its chairman, Harley O. Staggers, is favorably inclined toward approving the bill.

However, unless the bill could get through the Senate before this Congress adjourns, the measure will have to be introduced anew in the next Congress. Since there seems to be no change of getting the bill through both houses this session, the plan now is to have the bill introduced in both the House and Senate early next session.

As soon as the bill gets its fresh start, it is the hope of everyone interested in the successful passage of this important legislation hobbyists will renew their congressional petitions for speedy enactment of the Hobby Protection Act. It is anticipated a number of hobby leaders will be called upon to testify in behalf of the bill when it comes time for hearings.

Coin World commends the hard-working factions who support the Hobby Protection Act, introduced a year ago by Congressman Seymour Halpern (R-N.Y.). Experience is a good teacher, and next year's resumption of the campaign for its passage will bring the Hobby Protection legislation into law, we predict.

Mr. ECKHARDT. Thank you, Mrs. Russell.

You will all be available for questioning together? Mr. Hancock, how many more witnesses are there?

Mr. HANCOCK. Four.

## STATEMENT OF HARVEY G. STACK

Mr. STACK. My name is Harvey G. Stack and I am a partner in the rare coin firm of Stack's, with premises at 123 West 57th Street, New York, N.Y. We have served coin collectors for several generations and I personally have been active in the business since 1947. Although we are leaders in our specialized field of selling rare coins at public auction, we also conduct an active retail and mail order operation. I am appearing today to urge this committee to endorse and work for the passage of the Hobby Protection Act, now under consideration.

Coin collecting is not limited to people who search their pocket change in the hope of finding a bargain. The buying and selling of coins probably has an annual turnover of several hundreds of millions of dollars a year in this country. Last year, Stack's grossed over $5 million of which some $2.7 million was generated by our public auction sales. These figures resulted solely from dealing in ancient and modern rare coins in all metals and do not include handling bagged silver, rolls, or similar bulk merchandise.

Very substantial private holdings of coins are not at all uncommon today. For example, the collection which Stack's formed for the late J. K. Lilly over a 15-year period cost $2.2 million. I am sure you all will remember that it was recently acquired by Congress on behalf of the Smithsonian Institution for $5.5 million. In view of the very substantial sums involved in the hobby, I feel that the time has come for legislation aimed at preventing a number of improper practices which have developed over the years.

In the course of any given week we receive dozens of phone calls from people who think they have found a rare coin of great value. In most instances they prove to be the owners of the many copies, fakes or "genuine reproductions" of ancient or modern coins now found circulating among the general public. Many of these replicas have been distributed as candy premiums or sent to people as part of an advertising program. In some cases merchants have quite innocently sold them as genuine to customers as uninformed as they are themselves. Few of the fakes are ever marked as copies. Even museums do not mark the "genuine reproductions" they sell. Although such pieces are often accompanied by small brochures correctly identifying them, the papers quickly become separated from the "coin" after the original sale. As a result many ordinary people unfamiliar with the hobby have no way of knowing whether they have a genuine coin or not. Your bill should make it mandatory for all coin replicas to be clearly marked for what they are.

In addition to reproductions I have just mentioned, there is a much more dangerous type of copy used to defraud the public and even experienced collectors in some instances. I refer to outright counterfeits of ancient, foreign, and U.S. gold and silver coins, many of which are of very high technical quality. Our firm has appeared as experts and professional witnesses for the Treasury Department and the Department of Justice in many cases involving the sale or possession of counterfeits. During the preliminary investigation and subsequent trials we have seen how legal loopholes and antiquated laws have enabled the sellers of counterfeits to escape with light sentences, or no sentences at all.

I believe stronger regulations and penalties should be incorporated in this bill in order that the general public may be more fully protected against fraud represented by counterfeit rare coins than is at present the case. In addition, the public is accustomed to regard the dealer as an expert, and rightly so. For this reason your legislation should also make it mandatory for dealers to accept responsibility for the genuineness of the numismatic merchandise they offer for sale.

For these reasons, I urge this committee to act favorably on the legislation presently before it.

Mr. ECKHARDT. I'm sorry but we had better take a recess for a few moments. We will be back as soon as we can possibly get back, which should be about 15 minutes.

[Short recess.]

Mr. ECKHARDT. The hearing will be resumed.

## STATEMENT OF CHESTER L. KRAUSE, PUBLISHER, NUMISMATIC NEWS WEEKLY

Mr. KRAUSE. Mr. Chairman, my name is Chester L. Krause, publisher of Numismatic News Weekly, Coins magazine, Coin Prices, and the Standard Catalog of World Coins.

While I have prepared extensive remarks, much of it is repetitious. May I excerpt from it and have the entire document placed in the record? My remarks will only deal with that portion of the question which might provide some indication of the scope of the problem at hand. I think we are talking here today of hobbies that deal with the collecting of artifacts. The artifact hobbies are principally stamps, coins, and glass, as we heard this morning, and are the most popular collector subjects. As my interest in the pending legislation stems primarily from my full-time position as the publisher of several coin collector periodicals, my observations will be primarily based on my experiences in that hobby. I must first pause to explain, however, that coin collecting is really "numismatics," and its scope can be pinned down little easier than the word itself can be pronounced.

I hold in my hand a copy of the Brasher doubloon. Untold thousands of copies of this coin have been produced and released to the general public in connection with various promotional campaigns. While the literature which accompanied this piece clearly identified it as a copy, once such a piece becomes separated from the written word the individual into whose possession it falls has no means of identifying it as anything but genuine, and in the case of this particular piece he finds he has a coin which is listed as "unique" in the major catalogs.

This piece is typical of the hundreds of similar items which are produced each year, large quantities of which fall into the hands of people who are confused or deceived by them. While no problem can be legislated into oblivion, I believe that if it were required by law that such items as this Brasher doubloon replica be marked in a significant way—through the presence of a simple word like "copy," "reproduction," or the like thereon—the problem of confusion would be minimized.

While we realize that those items which are currently available will continue to plague both the collecting community and the general

public, the pending legislation would implant a giant step forward through its control of future emissions. If something is not done soon this is going to become an area of much greater confusion, as such pieces are being introduced in ever-increasing numbers and quality.

Now that I've covered each of the prime problem areas with which this legislation is concerned, I would like to take a few minutes to emphasize the scope of the problem's impact. Here I must base my observations primarily on the experience of Krause Publications.

In a year's time our three periodicals and standard catalog reach more than a million different coin collectors, about 150,000 of whom I would call hardcore numismatists. Most of these hardcore enthusiasts, like myself, find it pretty easy to identify such replicas as that of the Brasher doubloon, so they need not concern us too deeply here.

It is the other 85 percent of our audience, most of which is comprised of collectors of a more novice interest level, toward which most of our concern should be directed. These coin collectors, along with untold hundreds of thousands we do not even touch, and similar numbers with interests resting in other artifact fields, represent that element of the hobby which is badly harmed by the confusion and deception.

You can say that the problem rests with a hobby's overemphasis on the proverbial golden pot at the end of a rainbow, but that's far from a satisfactory argument. The fact is that one of the really great things about an artifact-collecting hobby is that you can have your cake and eat it, too; that is, when you are done enjoying what you have collected, you can expect to realize a monetary reward at disposition if you own the real thing.

That would conclude my formal remarks.

(Mr. Krause's prepared statement follows:)

STATEMENT OF CHESTER L. KRAUSE, PUBLISHER, NUMISMATIC NEWS WEEKLY, COINS MAGAZINE, COIN PRICES, AND THE STANDARD CATALOG OF WORLD COINS

Mr. Chairman and distinguished committee members: I am pleased to appear before you today in support of the proposed "Hobby Protection Act" which you are considering. I want to point out at the beginning that the impact of this legislation is not restricted to a narrow hobby field; the problem is one which confronts millions.

Hobbies which deal with the collecting of artifacts, including coins, possess not only monetary values, but also educational and therapeutic properties. They provide untold hours of rest and relaxation, commodities so sorely needed in today's fast paced society, in closing out the day for the man who has fought rush hour traffic, taught a class of children or operated under the strains of executive life.

Of the artifact hobbies, stamps, coins and bottles are the most popular collector subjects. As my interest in the pending legislation stems primarily from my full time position as the publisher of several coin collector periodicals, my observations will be primarily based on my experiences in that hobby. I must first pause to explain, however, that coin collecting is really "numismatics," and its scope can be pinned down little easier than the word itself can be pronounced.

Today's coin collector seeks all manner of monetary items from the earliest coins, which originated in Asia Minor during the 7th century B.C., to the latest Banuelos-Shultz dollar bills. The Hobby Protection Act is not required to protect the hobbyist from the more modern of these issues, as our nation's counterfeiting laws effectively deal with reproductions of legal tender items.

42

However, obsolete monetary issues from throughout the world and the American colonial period, are not subject to counterfeit laws. Neither are trade tokens or commemorative medal issues, nor obsolete paper money obligations circulated in 19th century America by private firms and banks, all of which fall within the numismatic realm. Our umbrella, I might add, also covers political badges, buttons and other memorabilia, and some choice collector items in this area were reproduced and widely distributed as novelty items during the most recent campaign period.

All manner of numismatic items which are rare or desirable have been reproduced in the past, and in all but a few isolated instances these reproductions have been devoid of any indication of their nature. In most instances, I must mention. I am certain that such issues were not produced with the intent to defraud, but in ignorance of the problems created.

Let me now illustrate to you just how the legislation being considered would benefit our hobby and the public. Among the coin reproductions I have brought along with me today is this yellowish pot metal copy of the Brasher Doubloon, one of the most historic coins of our post-Revolution period. Only three genuine gold Brasher Doubloons are known to exist, and if one would come on the market today it would undoubtedly bring over $100,000.

Untold thousands of copies of this coin have been produced and released to the general public in connection with various promotional campaigns. While the literature which accompanied this piece clearly identified it as a copy, once such a piece becomes separated from the written word the individual into whose possession it falls has no means of identifying it as anything but genuine, and in the case of this particular piece he finds he has a coin which is listed as "unique" in the major catalogs.

This piece is typical of the hundreds of similar items which are produced each year, large quantities of which fall into the hands of people who are confused or deceived by them. While no problem can be legislated into oblivion, I believe that if it were required by law that such items as this Brasher Doubloon replica be marked in a significant way—through the presence of a simple word like "copy", "reproduction" or the like thereon—the problem of confusion would be minimized.

While we realize that those items which are currently available will continue to plague both the collecting community and the general public, the pending legislation would implant a giant step forward through its control of future emissions. If something is not done soon this is going to become an area of much greater confusion, as such pieces are being introduced in ever increasing numbers and quality.

Now that I've covered one of the prime problem areas with which this legislation is concerned, I would like to take a few moments to emphasize the scope of the problem's impact. Here I must base my observations primarily on the experience of Krause Publications.

In a years time our three periodicals and standard catalog reach more than a million different coin collectors, about 150,000 of whom I would call hard core numismatists. Most of these hard core enthusiasts, like myself, find it pretty easy to identify such replicas as that of the Brasher Doubloon, so they need not concern us too deeply here.

It is the other 85 percent of our audience, most of which is comprised of collectors of a more novice interest level, toward which most of our concern should be directed. These coin collectors, along with untold hundreds of thousands we do not even touch, and similar numbers with interests resting in other artifact fields, represent that element of the hobby which is badly harmed by the confusion and deception.

You can say that the problem rests with a hobby's overemphasis on the proverbial golden pot at the end of a rainbow, but that's far from a satisfactory argument. The fact is that one of the really great things about an artifact collecting hobby is that you can have your cake and eat it too; that is, when you are done enjoying what you have collected you can expect to realize a monetary reward at disposition, if you own the real thing.

In my mind, Mr. Chairman, there is obvious need for activating the proposed Hobby Protection Act. I hope it can be accomplished without delay.

43

## STATEMENT OF JEFFREY COOPERSMITH

Mr. COOPERSMITH. Thank you for letting me testify for the Hobby Protection Act, H.R. 4678 and similar bills, and thank you for getting me out of school today.

My name is Jeffrey Coopersmith. I am a serious collector, and I live at 9201 Fox Meadow Lane in Potomac, Md. I am 13 years old and I am the founder and have, for 2 years, been president of the only junior coin club in Washington—the Washington Junior Coin Club. The club is for young people in the Washington-Maryland-Virginia area from ages of 8 to 21. It is sponsored by the National Bank of Washington.

I have been a coin collector since I was 9 years old.

I am here to speak for young people in favor of the bill to protect the millions of young coin collectors against the unlawful sale of coin reproductions as originals. Coin collecting is a great educational hobby, history and investmentwise. If you are a serious collector, you can get a lot of knowledge from a coin's background.

If there is no protection for a coin collector, the interest in this hobby could slowly disappear.

The young coin collector must be protected as most of them have only a little money and the hobby is expensive. Can you imagine how a young coin collector feels when he spends a life's savings on a coin that is a fake? It should be a criminal act to sell a fake as an original, so on behalf of the young people who collect coins I hope that you will pass this bill, so that innocent people can be protected.

Thank you, once again, for this opportunity.

Mr. ECKHARDT. Thank you. The clerk will write an excuse to your teachers.

Mr. Pittman?

## STATEMENT OF JOHN JAY PITTMAN, PRESIDENT, AMERICAN NUMISMATIC ASSOCIATION

Mr. PITTMAN. Mr. Chairman, gentlemen of this committee, my name is John Jay Pittman of 4 Action Street, Rochester, N.Y.

Today, I appear before this committee as president of the almost 28,000-member American Numismatic Association—the ANA—which has a Federal charter granted by the U.S. Congress in 1912. Incidentally, I'm also the immediate past president of the Canadian Numismatic Association.

I've been collecting coins since I was in high school, over 45 years ago. In this time I have had enough experience with genuine, original coins that I don't think I would be victimized by any reproduction. In fact, regarding many of the reproductions which are being sold today, I believe I know who made them, when they were made, and how and where they were made.

Many of the 28,000 members of the ANA are the sophisticated, experienced collectors. Many of those 28,000 members are able to protect themselves against reproductions.

So, today I am pleading the case of the other ANA members, and the millions of collectors who are not ANA members, and who are not able to protect themselves. Those are the collectors who trustingly buy these reproductions. And especially I am pleading today for the

44

thousands . . . maybe a million . . . of the 10- to 14-year old young-sters who collect coins. Those teenagers save up their money to buy coins. And most of them, at some time or other, are sold reproduc-tions. Later they learn they've been swindled. Gentlemen, you should see the look of disillusionment on the face of a teenager when he finds out he's been swindled.

Incidentally, Mrs. Mary Brooks, the director of the U.S. Mint, who could not testify today, stated last Saturday in California that she has mail orders for 29,000 penny bags. A "penny bag" contains five U.S. pennies (cents) from the U.S. Mints, Philadelphia, San Francisco, and Denver. These are primarily for young children. She has 2,700,000 orders for proof sets. Those are the proof sets made by the U.S. Mint for sale to collectors. You can see there are quite a few people inter-ested in this hobby of ours.

Gentlemen, I want you to know that the Hobby Protection Act is not designed to protect just a handful of coin collectors. It's designed to protect millions of collectors—collectors in all kinds of hobbies—against fraud. It has been pointed out that these collectors are not being protected by the FTC.

Finally, the coin collecting hobby is not just a hobby in which a few thousand dollars change hands each year. The dollars involved in the coin collecting hobby, alone, gentlemen, are in the millions . . . in the eight or nine figures annually.

Gentlemen, I do hope that you'll vote favorably upon the Hobby Protection Act.

Thank you, gentlemen, for your time.

Mr. ECKHARDT. Mr. Pittman, it strikes me if we pass this bill, we may be acting against your interest. It would be as if we placed the word forgers after their name, and might put the handwriting experts out of business.

Mr. PITTMAN. As you know, a similar hobby protection bill was in-troduced in the 92d Congress, 1st session, H.R. 10600, by Congressman Seymour Halpern, who was a collector of autographs and political items. He knew that fake autographs and fake political items were being offered to collectors and intended that this bill H.R. 10600 would protect autograph collectors.

Mr. ECKHARDT. Thank you.

Mr. PITTMAN. Thank you, sir.

Mr. ECKHARDT. I have few questions. I suppose I should direct them first to Mr. Hancock.

Mr. Hancock, you had referred to a bill I intend to introduce. I have one, so I am very interested in your comments about some of the mat-ters here. In the first place, it would include a reference to importation as well as manufacture. I think your suggestion of "copy" rather than "reproduction" sounds to me to be a practical one and I see no advan-tage of the word "reproduction" over the word "copy," do you?

Mr. HANCOCK. "Copy" is understood by everybody.

Mr. ECKHARDT. I think it would probably be just and reasonable to use the word "copy" so some uniform terminology would be just and applicable. You have suggested an alternative but it would seem to me perhaps just "copy" would be sufficient.

Mr. HANCOCK. I agree.

45

Mr. ECKHARDT. I believe you include both the word "reproduction" in the original bill—we say "copy" now—and the date of manufacture. If the word "copy" is placed on a coin, is it necessary also to put the date of manufacture?

Mr. HANCOCK. No, it is not. "Copy" is self-explanatory.

Mr. ECKHARDT. It seems to me we should put the least burden on the producer of a reproduction so as not to deface his coin. I think there is sometimes a legitimate reason to reproduce coins but no legiti-mate reason to use them as a fraudulent statement that they are originals.

Mr. HANCOCK. I think all agree.

Mrs. RUSSELL. Provided it can't be filed off or flicked off with your fingernail.

Mr. ECKHARDT. Yes, I understand you suggested a rather lengthy description of how it should be incused in the coin.

I have suggested in the draft of the bill I intend to introduce simply language like this, "The Federal Trade Commission shall prescribe rules in accordance with section 553 of title 5 of the United States Code to determine the manner and form in which hobby items shall be permanently marked."

Perhaps this should be a little more flexible. Perhaps this is better within the rulemaking function of the Commission than as specified in the bill. We may not imagine all the problems that would be in-volved. I understand your concern about not permitting an inadequate marking as, for instance, a raised date that can easily be moved off. But I think to some extent we must trust the rulemaking body to also recognize facts. What is your comment?

Mr. HANCOCK. My comment is if it is just shallowly incused into the coin, then if the lady who buys it as a reproduction, because it says "copy," but she wants to sell it as genuine, she can start over near the margin and excavate some of the metal to eliminate that. This is why I said perhaps a millimeter of the coin. There is a coin some place in this group, of course, with a mint mark removed. In this case, you would be able to recognize the shallowness.

Mr. ECKHARDT. I think the completeness of your description indi-cates probably the desirability of addressing specific problems. There may be other problems, the marking of a political poster, or the prob-lem of fake stamps which may call for just as complete a description, and perhaps it would be best for the bill to give that authority to the Federal Trade Commission rather than to attempt to anticipate all of the problems in a piece of legislation.

Mr. STACK. I believe I can speak for the people appearing today, if the bill gets as far as implementing by regulation, the members would be happy to come down again and assist the committee or the FTC, whoever is implementing the regulations you set forth. Tech-nology today permits the striking or marking of a coin with both incused and raised lettering simultaneously if the person manufactur-ing it wants to do it. You could do both operations simultaneously. It doesn't require a second manufacturing technique.

Mr. ECKHARDT. There are several questions in my mind arising from definitions used, or rather from the statement of purposes of the act in which several hobby items are referred to. That is on page 3,

46

"any political button, poster, literature, sticker, or any advertisement used in any political cause" seems to be rather self-explanatory.

(b) Coin or related item. Why add the term "related item" and what do you refer to that would not be referred to by the term "coin"?

Mr. HANCOCK. There are commemorative medals or presentation pieces sold by coin dealers and collected by coin collectors. They are metal and look like coins. They have varying market values also. So we might restrict this, if you want, to meet all hobby items.

Mr. ECKHARDT. That would rather enlarge it, I am afraid, if we said that. How would it be to just use the term "coin" and have a definition of the term "coin?"

Mr. KRAUSE. I alluded to that when I mentioned the wide scope of the word "numismatics." You see numismatics is a term which encompasses anything in the monetary realm. That is a coin. But with a coin that is legal tender. There is no problem because we have counterfeiting laws. On the other hand our hobby is concerned with obsolete coins dating from the 7th century B.C. down to the present. Those coins are involved.

In the early history of our country we used tokens as a medium of exchange. While we might call them a half cent, cent, or penny, today they are no longer legal tender. Also then, tokens, which are substitutes for money, are part of the hobby. A medal which is basically a commemorative item is also included.

When we talk of monetary terms we talk of paper and, again, if paper money is a legal tender issue counterfeit laws will cover this. But we have many pieces of obsolete currency such as continental currency notes of the American revolution, or that type of thing.

Mr. ECKHARDT. Did you intend to cover paper money by related items under the term "coin?"

Mr. KRAUSE. This is a probability. We have some here. For instance, the $3 bill, I know we get calls—I guess this is a $4 bill—about such notes which are reproductions. This type of thing is definitely a problem. In this case presence of the simple word "copy" would very well settle that problem.

Mr. PITTMAN. Here is a good case of a piece intended to circulate as money but it is not recognized by the U.S. Government since it is not a legal tender issue of the U.S. Government. This replica of gold is from Colorado, Senator Dominick's State. If this were genuine, it would be a $20,000 or $30,000 item. These copies are being passed around and people are thinking they are genuine. This is a case where incused copying would fit very well. It is token money that circulated in the Territory of Colorado a hundred years ago.

Mr. ECKHARDT. Suppose you use the term "coin" and define it as including commemorative medals, coins, tokens, or paper money, or any items that have been used in exchange.

Mr. STACK. You have colonial currency which was issued by the various States and also the Continental Congress before the federation and national coins came to being in 1793. You have a problem where they are preparing these things on a parchment stained paper and selling them in various packets in various hobby stores and 5 or 6 years later they turn up in grandma's old shoebox and people come in thinking they have found a collector's item of great value. None of those have "copy" affixed to them and they are truly reproduction on parchment paper.

47

Mrs. RUSSELL. Would you consider using the word "currency?" I am afraid if you use the word "copy" it will lend a great amount of confusion. Does not "currency" involve all this material; then break that down?

Mr. ECKHARDT. I think "currency" implies it has a current exchange value. I think "coin" is all right if we define it. After all, it is whatever the statute defines it to be.

Mr. HANCOCK. I like your description, Mr. Chairman.

Mrs. RUSSELL. I think the Treasury uses the term "currency" as all-inclusive.

Mr. ECKHARDT. What about things that never had an exchange value and are not really commemorative of any particular time, such as the Presidency of the United States.

Mr. KRAUSE. These are included in the term "medal."

Mr. ECKHARDT. I wouldn't read that as such.

Mr. HANCOCK. Here is a silver ingot. This was manufactured by the man who is the pit boss of the Dunes Hotel in Las Vegas. These things circulated as money or exchange back in the silver-rush days. He is still making them to this day. He does very nicely; he specializes in the Arizona Assay Office. There was one at one time but it is no longer in existence. He manufactures them in Las Vegas, then sends them down to his office in Phoenix—to an office—and the guy assays the weight and purity of the silver in them, and the purchaser believes they are genuine.

Mr. ECKHARDT. They have been used as exchange because of the definition. I wonder if we should protect the thing that is not really commemorative, not really used as a method of exchange, but a medal that is decorative. Is there any real reason for protecting that?

Mr. HANCOCK. You say the things used in exchange—that covers a waterfront.

Mr. STACK. That brings to mind that next month we are selling properties of the Massachusetts Historical Society. Among their holdings are Indian peace medals issued by the Congress of the United States—large silver pieces during the early 1800's through the 1870's.

Mr. ECKHARDT. Were they commemorative?

Mr. STACK. Yes; they were a token of friendship; the Great White Father Abraham Lincoln was on it. They sent it out West and used it as a peace token. These things have been reproduced—there are fakes of the Indian peace medal. These were items originally issued by the U.S. Government. Similarly, items have been issued by other governments whether for presentation, peacekeeping, or whatever the issue. So I think you would have to say it would fit in with medallic, or what would be construed as numismatic, and that can be defined.

Mr. ECKHARDT. I think we have a pretty good idea what you want done. I would like to talk of this term "any stamp." First, the cover blocks of four, and then what troubles me is "any stamp related item." What is a "stamp related item" that would not be covered under "stamp"? First, the cover blocks of four.

Mrs. RUSSELL. A philatelic-numismatic combination. The Treasury Department does a great business there. The two hobbies were "married." There is a commemorative stamp and a commemorative medal. The first was when the new Philadelphia Mint was dedicated. The American Revolution Bicentennial Commission is issuing a series of "PNC's."

Mr. ECKHARDT. If they were covered separately, the combination would be covered. I even have a question as to why blocks of four, if you cover stamps.

Mrs. RUSSELL. Stamps are covered very well with present laws.

Mr. HANCOCK. There is an American in Manila who has made for himself dies in Taipei. He takes the stamp, which is nominal in price, and prints the surcharge. He does that himself, which increases the value a hundred dollars where the country has raised the value of the stamp. This is called surcharging.

Mr. ECKHARDT. Does a stamp belong in the bill at all?

Mrs. RUSSELL. I checked this out with some stamp people and they said they have no problems.

Mr. ECKHARDT. If they have no problems, I think it creates problems for us to define stamps. It might be better if we left it out.

Mr. HANCOCK. It was my original idea to bring in as many hobbies as I could to impress you gentlemen. The Houston Chronicle had this article, which tells how many more chairs there are in the Chippendale collection than Mr. Chippendale ever got around to making. I believe the president of the Antique Dealers Association lives in Houston. I sent him a copy of the bill I forwarded to you. I have not heard from him. I called a couple of antique dealers—one in New Orleans—and they asked me to be very quiet about antique dealers because they have a lot of Chippendale chairs.

Mr. ECKHARDT. Did you have the same thought in mind when you put in political buttons?

Mr. HANCOCK. Yes. If you are limited to paper money and coins, I will gamble on the Congress being willing to vote the thing out.

Mr. ECKHARDT. You do not feel A and C in this listing are salient?

Mrs. RUSSELL. Political items people are quite active, pioneers in the "fake fight."

Mr. STACK. Political items people would disagree. Stamp people are protected by currency laws. Reproductions of political——

Mr. ECKHARDT. What about foreign stamps? Are they protected with respect to foreign stamps?

Mr. STACK. I think by international agreements.

Mr. HANCOCK. I might mention Mr. Harris Martin is the special agent in charge of the Secret Service here in Washington. This Brown I know manufactures pine-tree shillings in mass, and I expect he has been making 1894 U.S. dimes. He is the one with the stamp surcharges. First of all, I asked Mr. Martin, is there anything the U.S. Government can do to put the heat on on the Philippine Government because we pour so many dollars in there. He says there wasn't a prayer of having the Philippine Government take any action.

I feel if we limit this to coins, we take out 95 percent of the problems that the numismatic associations have.

Mr. ECKHARDT. Let me turn to another point. In some of the questions that I had asked on the previous bill, I raised the question of the possibility and probability of enforcement by the Federal Trade Commission. Of course, whenever we add new duties, to some extent we dilute their ability to enforce present regulations. There are only 226 people in the consumer protection enforcement activities at headquarters and 396 people in the regional offices. This is the reason I

suggested to you that if we provide very broadly for concern by the Federal Trade Commission in the question of enforcement, we may not be getting everything we think we are by a bill. I had suggested as a possibility in this bill a provision saying that the manufacture in the United States or importation into the United States for introduction into commerce of any hobby item described in section 5(1), which is a reproduction of such an item which is not plainly and permanently marked "copy" is unlawful and is an unfair or deceptive act or practice under the concept of the Federal Trade Commission Act.

That would permit the Federal Trade Commission to follow its ordinary processes respecting cease and desist orders if, after a cease and desist order was issued and not followed, the FTC could bring enforcement proceedings which could include various penalties.

I have here a second possible area of relief—the Federal Trade Commission shall prescribe rules in accordance with section 553 and then in section 4 any interested person shall be entitled to injunctive relief pertaining to violations of section 3(A) of this act and may therefore sue in any district court of the United States without respect to the amount in controversy and shall recover cost and damages in any suit, including any reasonable attorney's fees. This is patterned after the gold and silver stamping provision. The Commission for many years has not enforced the old act. A few years ago we passed a bill which would permit self-help in this area. Perhaps this is what may be needed here.

Mr. HANCOCK. I would say that has real teeth and I am delighted. Actually, in practicality, all you would need to do would be to get one lad on the hook and I think it would scare the rest of the promoters of these things.

Mr. ECKHARDT. This would be some of these actions that might not involve a great amount of damage to those bringing the action but the provision for reasonable attorney's fees as well would probably make it meaningful.

Mr. STACK. I think if you gave it that type of teeth, they could be sued. There are loopholes in this caveat emptor. As you know, I mentioned in my testimony that I felt the dealer is considered an expert and should therefore be held responsible for his actions. With what you are proposing, let's say the item is a $10 item, the law provides for a class action and he could collect for 50 people or any number that were taken in.

Mr. ECKHARDT. This language would permit class action.

Mr. STACK. I think you provided complete relief to those who have brought something that was misrepresented. I am sure the local trade publications would support getting people to join the class action. You would have a good effect once we know something could be done. If I may disagree a moment, the big problem which the Secret Service has today is proving intent. I can tell you, as I mentioned in my testimony, we appeared on numerous occasions——

Mr. ECKHARDT. If they didn't put "copy" on it, they would be in violation of law.

Mr. STACK. I think this would help the Treasury Department.

Mrs. RUSSELL. Congressman Eckhardt, you would have about a hundred thousand law enforcement agents, each collector would have a commitment to follow this through. May I suggest, that Mr. Pittman

50

send you a copy of the American Numismatic Association Dictionary of Terms, which gives all the numismatic definitions.

Mr. PITTMAN. I will see that you have that in tomorrow's mail. I think you will find our ANA Numismatic Terms dictionary definitions of coin, token, medal, and currency helpful.

Mr. ECKHARDT. Such will go in the files of the committee without objection.

(The dictionary referred to may be found in the files of the committee.)

Mr. ECKHARDT. We will stand in recess subject to call of the Chair.

(The following telegram was received for the record:)

[TELEGRAM]

AMERICAN POLITICAL ITEMS COLLECTORS,
*Chicago, Ill., March 6, 1973.*

Hon. HARLEY O. STAGGERS,
*Capitol Hill,*
*Washington, D.C.:*

The American Political Items Collectors is very pleased the testimony is being heard on H.R. 4678 and we support the ideas represented in this bill. This effort can curb the critical problem of campaign item reproduction which now is detrimental to the growing hobby of political Americana collectors. It particularly would aid the newer and younger collector who cannot distinguish between the real item and its reproductions. These collectors are preserving, studying and documenting a large segment of America's history. They must not be discouraged or dissuaded by the growing problem of fakes. I am sorry APIC was not represented at the initial hearings for H.R. 4678. Written testimony will be submitted in behalf of APIC and we stand ready to be called if you need further testimony or if further hearings are deemed necessary.

LARRY L. CRUG,
*President, APIC.*

(Whereupon, at 3:15 p.m., the subcommittee adjourned.)

○